OPINION
Plaintiff-appellant Danielle Romer, executrix of the estate of Rupert LeJeune, appeals from an order adopting a magistrate's decision, which held that defendant-appellee Ramon R. Bucio had paid in full the amount Romer claimed he owed to LeJeune on a promissory note. Romer asserts that the trial court's decision is against the manifest weight of the evidence. At the very least, Romer argues, Bucio owes interest on the note, because some of his payments on it were late.
We conclude that the magistrate's decision is not against the manifest weight of the evidence because there is some, competent, credible evidence showing that Bucio had paid the note in full. We further conclude that while Bucio was late in making some of the payments on the note, LeJeune had already been adequately compensated for the late payments, because the evidence presented showed that Bucio had overpaid the loan by a significant amount. Accordingly, the judgment of the trial court is Affirmed.
 I
Bucio met LeJeune in 1974. Bucio and one of his brothers lived with LeJeune from April, 1974, to June, 1976; Bucio paid LeJeune rent and performed household chores for him. In 1980, Bucio opened his own restaurant, Pepito's Mexican Restaurant. On March 25, 1987, Bucio obtained a $44,500 loan from LeJeune. In return, Bucio signed a promissory note, requiring him to pay LeJeune $536.32 per week for 90 consecutive weeks, beginning April 2, 1987.
In 1994, LeJeune asked Romer, his niece, to manage his financial affairs, due to his deteriorating health. In the latter half of 1994, LeJeune showed Romer the note executed by Bucio, and told her that Bucio had not paid it. When Romer asked LeJeune what he intended to do about it, LeJeune told her that he was "handling it," by speaking to Bucio "frequently," and asking him for repayment.
LeJeune died on March 16, 1996. On July 31, 1996, Romer filed a complaint in the Montgomery County Common Pleas Court, alleging that Bucio had defaulted on the promissory note. Bucio filed an answer, alleging that he had paid the note in full. The matter was referred to a magistrate. In March, 1997, Bucio moved to have the complaint dismissed upon the ground that it was barred by the statute of limitations. The motion was overruled. Bucio renewed his motion in May, 1997; again, it was overruled. After he sought and received verification of the latter entry overruling his motion to dismiss on statute of limitations grounds, Bucio appealed the trial court's decision to this court. In December, 1997, this court dismissed Bucio's appeal for failure to complete the record pursuant to App.R. 9 and 10. Once the matter was reinstated in the trial court, Romer moved for summary judgment, arguing that Bucio could "offer no admissible evidence to support his assertions that he has paid under the Note." Bucio filed a memorandum in opposition to Romer's motion. On April 13, 1998, the magistrate issued a decision and entry overruling Romer's summary judgment motion.
Romer's action on the note finally proceeded to trial on April 21, 1998. One of the witnesses who testified on Bucio's behalf was Louis G. Homan, a certified public accountant. Homan testified that he has been Bucio's accountant since 1982, and that he had been LeJeune's accountant from 1986 until 1994. Homan testified that after examining several financial documents, including Bucio's and LeJeune's income tax returns from 1987 through 1989, and the cash disbursement ledgers from Bucio's company, Mexico Lindo, it was his opinion that Bucio had paid in full the amount due under the note.
In August, 1998, the magistrate issued a decision, holding that Bucio had met his burden of proving that the note had been paid in full. Romer filed objections to the magistrate's decision, essentially arguing that the magistrate's finding that Bucio had paid the note in full was against the manifest weight of the evidence. Bucio also argued that, at the very least, some of the payments on the note were untimely, and, therefore, interest was owed. On January 29, 1999, the trial court issued a Decision, Order and Entry, overruling Romer's objections, and adopting the magistrate's decision.
Romer appeals from the trial court's January 29, 1999 order.
 II
Romer's sole assignment of error states:
THE TRIAL COURT ERRED BY ADOPTING THE MAGISTRATE'S DECISION.
Romer argues that trial court erred in adopting the magistrate's decision because the magistrate's finding that Bucio had paid the note in full is against the manifest weight of the evidence, or, at the very least, Bucio owes interest on the note because some of his payments were late. We disagree.
Payment is an affirmative defense that must be pleaded and proved. In re Estate of Buckingham (1967), 9 Ohio App.2d 305,309; Civ.R. 8(C). "The party who asserts payment as a defense bears the burden of proving payment by a preponderance of the evidence." Blackwell v. Internatl. Union, U.A.W. (1984),21 Ohio App.3d 110, 111. A "preponderance of the evidence" is "evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not." Black's Law Dictionary (6 Ed. 1990) 1182. A judgment that is "supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77,80.
Here, Bucio testified that he made each of the payments that were due under the promissory note. When asked by Romer's counsel if he had made the payments "each and every week for ninety weeks," Bucio responded in the affirmative. It was later demonstrated, however, that Bucio had not, in fact, made a payment "each and every week," but, instead, had made some of the payments once every two weeks, and had made some of the payments after the date upon which the final payment fell due under the terms of the note, i.e., December 15, 1988. Under questioning from his own counsel, Bucio, who is not fluent in English, indicated that he had not understood the question from Romer's counsel, and that when he testified that he had made a payment "each and every week," he was simply saying that he had made each of the payments due under the note.
Bucio's testimony was corroborated by his accountant, Homan, who testified that he examined the cash disbursement journals for Bucio's corporation, Mexico Lindo, and prepared a summary of the checks that were issued to LeJeune from November 4, 1987 to May 18, 1989. That summary was admitted into evidence as "Exhibit I," without objection. Homan testified that the payments made by Bucio to LeJeune during that period amounted to $34,527. Most of those payments were either for $537 (as a result of Bucio's decision to "round off" the $536.32 amount that was actually due), or for $1,074 (as a result of Bucio's decision to make some of the payments on a bi-weekly, rather than weekly, basis). Homan acknowledged that he did not have any cash disbursement records for the period of April 2, 1987 to October 31, 1987, because those records had been lost or destroyed. Nevertheless, Homan concluded that since the payments for the period for which records did exist were "so consistent," it could be inferred that the 31 payments that fell due during the period from April 2, 1987 through October 31, 1987, were also made consistently, though he acknowledged that he could not verify it.
Assuming for the moment that Bucio did make the 31 payments that fell due between April 2, 1987 and October 31, 1987, and that he rounded the payments to $537, as was his practice, then Bucio would have paid a total of $51,174 on the note ($537 x 31 = $16,647; $16,647 + $34,527 = $51,174). The "Amortization Model" used by Homan, which had been provided to him by Bucio, showed that a total of $48,330 should have been paid altogether on the note (including both interest and principal).[1] Thus, as Homan opined, it appears that the note was overpaid by Bucio by as much as $2,844 ($51,174 — $48,330 = $2,844).
The key question that remains is whether some, competent, credible evidence was presented to show that Bucio did, in fact, make the 31 payments that fell due between April 2, 1987 and October 31, 1987. In our view, there was. First, a number of witnesses, including Denise Swihart, Franco Imparto, Jorge Bernal, and Joe Reece, testified that LeJeune was a "sharp businessman," who would lend money to others, but who would insist upon prompt repayment.
Second, a review of Homan's summary of Bucio's cash disbursement journal does show consistent repayment of money due on the note from November 4, 1987 through August, 1988. The payments were either made weekly in the amount of $537, or bi-weekly, in the amount of $1,074. It does appear that several payments were missed during this period, and that several more were missed in September and November of 1988. However, these payments were made up in the first part of 1989 (three $1,074 payments, made in January, 1989; and five $1,000 payments, made in March, April, and May, 1989).
Third, and most importantly, Homan testified that when Bucio came to him in 1988 to have his 1987 tax return prepared, Bucio showed him the promissory note, as well as the Amortization Model, in order to obtain a deduction for the interest that he had paid to LeJeune on the note during 1987. Bucio informed Homan that he had paid on the note in accordance with the Amortization Model. Homan examined the Amortization Model and determined that Bucio would have made 37 payments on the note, and, therefore, would have paid $2,176 in interest to LeJeune in 1987.
At that time, Homan, who had already completed LeJeune's 1987 tax return, realized that he had not included the $2,176 in interest as income on LeJeune's return. Consequently, Homan sent LeJeune a letter in May, 1988, informing him that his original 1987 tax returns had to be amended to reflect the $2,176 in interest income he had received on his loan from Bucio. The letter also informed LeJeune that Bucio had made 37 payments on the note in 1987, for a total payment of $19,869, and that $2,176 of the total payment was for interest, while the remaining $17,693 was for principal. Enclosed with the letter was LeJeune's amended 1987 tax return, reflecting the $2,176 in interest income.LeJeune never contacted Homan to complain about the letter, or theinclusion of the $2,176 in interest income on his amended 1987 taxreturn.
Romer correctly points out that 40 payments were due in 1987, not simply 37. Consequently, Romer asserts that LeJeune's 1987 tax return was "totally inaccurate," and, therefore, could not provide reliable evidence that all of the payments that fell due between April 2, 1987, and October 31, 1987 were, in fact, made. We disagree. First, Bucio never told Homan that he had made 37 payments in 1987. Instead, Bucio simply gave Homan the promissory note and the Amortization Model, and told him that he had paid in accordance with the schedule. The fact that Homan determined from these documents that Bucio made 37 payments in 1987 simply shows that Homan made a miscalculation as to the number of payments that fell due in 1987, under the terms of the note. Furthermore, as Homan testified, the mistake was not material to this case. Because 40 payments fell due in 1987, rather than 37, Homan should have shown that Bucio paid about $2,305 in interest, and $19,175 in principal to LeJeune in 1987, pursuant to the Amortization Model, rather than simply $2,176 in interest, and $17,693 in principal. If Homan had sent LeJeune a letter informing him that Bucio had actually paid to him $2,305 in interest, and $19,175 in principal on the note in 1987, this would have given LeJeune an even greater incentive to raise objections with his accountant, if in fact he had not received payment in that amount. The fact remains that LeJeune said nothing to Homan about the letter saying that Bucio had paid $2,176 in interest, and $17,693 in principal on the note in 1987, or the inclusion of the $2,176 in interest on his 1987 amended tax return. Therefore, it is reasonable to infer that LeJeune did receive the payments that fell due between April 2, 1987 and October 31, 1987.
The documents placed into evidence do show that Bucio made a number of payments after December 15, 1988, the date on which the final payment fell due under the terms of the note. For instance, Exhibit I shows that three, $1,074 payments, and five, $1,000 payments, were made between January 4, 1989, and May 18, 1989. However, as explained earlier, Bucio's payment history on the loan did not become sporadic until September, 1988. For all of the reasons listed above, it appears that Bucio made all, or, at least, nearly all of the payments that fell due from April 2, 1987, to October 31, 1987; thus, it appears that Bucio overpaid the loan by as much as $2,844. Pursuant to the Amortization Model, the promissory note called for a total interest payment of $3,356.23. Accordingly, the evidence shows that LeJeune had already been adequately compensated for Bucio's late payments, even assuming that Bucio missed a payment or two during the April 2, 1987 to October 31, 1987 period.
Because we conclude that the finding that the note was paid in full is not against the manifest weight of the evidence, Romer's sole assignment of error is overruled.
 III
Romer's sole assignment of error having been overruled, the judgment of the trial court is Affirmed.
GRADY, P.J., and WOLFF, J., concur.
Copies mailed to:
Richard B. Reiling
Isabel Suarez
HON. JOHN KESSLER
[1] For purposes of clarity, it must be noted that the Amortization Model assumed that Bucio would make a weekly payment of $537, rather than simply $536.32, as specified in the note. Thus, the total payment that Bucio needed to make to LeJeune under the terms of the note, i.e., $48,268.80, was $61.20 less than the total amount listed on the Amortization Model used by Homan. The $61.20 represents the difference between $537 and $536.32 multiplied by 90, the total number of payments due on the note ($537 — $536.32 = $0.68; $0.68 x 90 = $61.20).